We remind you that in the 9th Circuit, your time is counted down. Once the red light is off, the clock will continue to run. It's not showing you how much time you have left. It's showing you how much time you are now over. So you will have to monitor your own time. If you do deserve time for rebuttal, you can monitor that yourself. May it please the Court, My name is Elizabeth Duncan. I'm appearing on behalf of plaintiff appellants, who I will collectively refer to as Hemstreet. This appeal concerns whether there is an issue of fact as to when the contractual limitations period began to rise in this case. Hemstreet admits that no matter how you attack this case, there are questions of fact. The first possible trigger date for the commencement of the limitations period is the one relied on by defendants, and that's December of 2000, when Hemstreet was interested in selling the Lincoln City Shiloh Inn. The initial question of fact, and it's a glaring one here, is was there ever a real offer to purchase that property. On this record, there was not. The defense argues, I think they take liberty with John Wheeling's deposition testimony, that appears in the excerpts on page 13. Mr. Wheeling never says he had an offer to purchase that piece of property. He had potential interest in the property, and that's why he sought to have properties released, not just the Shiloh Inn, but was generally inquiring about having the properties released from the loan pool. But he never had an actual offer, a real offer, to purchase that property, and it was never listed, and so there was never an offer to purchase it. But the second possible trigger date, the opposite end of the spectrum here, is when Hemstreet did receive an actual offer to purchase one of the hotel properties. That was the Delano Hotel, and that occurred in November of 2001. That's when Hemstreet believes or claims to have actually been harmed because then, when that property was not released, we could not sell the Delano Hotel for $2 million. Those two dates at the opposite ends of the spectrum here show the question of fact as to the proper interpretation of the contractual limitations period. Mr. Neelan's interpretation of that provision is that it was triggered when Hemstreet actually lost the sale, a real sale, and that's the occurrence of a harm. So you're telling us that there cannot be any breach until earlier than November 2001, contractually? That's our position, yes, sir, because that's the first— So it would be your position then that November 2001 is when the statute of limitations was triggered? When that contractual—yes. Now, the problem then is whether you can get the benefit of a two-year statute of limitations or whether it's a one-year contractual statute of limitations. Is that right? I'm not sure I understand the question. Well— If it's November— November 2001, then it's just when the—take that as the date when you have a cost action. Right. Then we have to—you don't file suit until March 2000—I'm sorry, March 2003. Is that correct? Yes. No, the complaint filed in December of 2002. Sorry, December of 2002. December 18th of 2002. It was filed in state court and it was a move. Okay. So the complaint filed in 2002, if your claims arise in November of 2001, it's usually something more than a one-year statute of limitations that you filed trying to contract. Yes, there was bankruptcy. All these problems came to bankruptcy in March. And so the running of the limitations was pulled for two years. So by filing in March of 2002, the bankruptcies were filed. It was given until 2004 to actually file the complaints. But we filed them in December of 2002. At the time when you learned that Merrill Lynch was not going to do anything, do you think it was possible for you to get the police to prosecute him? Wasn't that in January of 2001? That is the date that—that's the third possible trigger date. That's the date that Judge Haggerty relied upon. Right. It was on—and that was prompted by the letter from Merrill Lynch, which stated, and this is a very interesting twist in the case, because it stated, Merrill Lynch continued to believe that the request for a release of one or more of the properties should be directed to the servicer, since any decision to release the property is knownly made by the servicer. Fine. They had been saying that, and we've gone between Merrill Lynch and Midland at that point, and come into the other one saying we need to get their permission. Okay. So that's the last word we received from Merrill Lynch. The judge then, three weeks later, on February 9th of 2001, Henstreet and Cunningham, who was the new servicer on these properties, entered into a negotiation agreement, saying, So let's talk about it. An actual— Our position, as stated in our reply brief, is that under no discrepancy, that should be sufficient. When we say that Merrill Lynch and its asset needs, and in the contract cause of action we state that Merrill Lynch caused the properties not to be released through their actions, we believe under notice pleading that's sufficient. And Crimmy May stepped into the shoes of Midland, which was the servicer for Merrill Lynch, stepped into their shoes, and they specifically entered into a negotiation agreement, and that negotiation agreement contained a tolling provision for all applicable statutes on the property. That tolled the statute for seven months. And if you look at that and you get that effect, then any of these true debates are in place timely. We just have to make it. I don't know whether the timing of the bankruptcy was confusing or not clear in the record, but we just have to make it until one year before the bankruptcy was filed. Counsel, why didn't you raise that tolling issue? I'm not sure, Your Honor. Our position on that tolling agreement is that it was before the court. It was not argued to the court. But the agreement was in the record. We did argue the position and the actions of Crimmy May as being important in the whole analysis. But, no, the tolling agreement was not specifically argued. May it please the Court, Bruce Campbell on behalf of the Appalachian Merrill Lynch Mortgage Capital and Merrill Lynch Credit Corp. We agree that the case presents a very straightforward question of whether the plaintiffs asserted their claim in the one-year contractual limitations period. And I would submit that the undisputed facts here show that the claim is still up for filing and is still pending now. The starting point is really to look at the language that the contract provides for the limitations period. It has a very quick trigger. It's not presently. In the statute, the limitation period does not begin to run. It's a cruel overplay. Instead, it says that the plaintiff has acquired knowledge of the first act of clearance or omission with any claim to space. Well, let me ask this. Let me ask this, Counsel. I understand Ms. Gunther's position. It's not until they have a firm offer, and Merrill Lynch has declined to do that. In other words, from their perspective, she's arguing, I think she's arguing, that you said, well, if you're presented with a firm offer, we won't honor that, and there's some back and forth, and she's obviously very, very unhappy about that. Why is that a reasonable position? Well, Your Honor, I think that there are several reasons for that. First of all, in the Oregon law, you can file a claim through the statute of limitations for a claim to the contract that's approved at the time of the breach. It doesn't require damages to the claimant. I understand that, but why is it? Why is it? That is, if you were to come to us and you said, look, I'm thinking, I think I've got a buyer, you know, I want to do this, I want to do this, I want to restructure our relationship with this claim, Merrill Lynch would say, well, no, you have to talk to Midler. In any event, he gets very angry and starts to write a piece about fraud. But that looks like a sentence. It doesn't look like he's got an offer in his hand. It looks like he's saying, I'm thinking about doing this. You know, how can we make this work? Well, Your Honor, I believe that the record shows that the letters that came from the Femme Street were a lot more specific to that. They say that we have, we are being damaged, we are currently suffering harm because of your failure to release the properties that we've lost in a lot of locations. Mr. Midler, in his deposition, said in the fall of 2000, they had a buyer. The buyer knew how much they wanted to sell a specific piece of property for and was willing to pay that price. So, yeah, they did not have a written offer at that time. They were far enough down the road where it was very clear that they had this. It was more than an anticipatory brief. Merrill Lynch made it crystal clear in the fall of 2000 to Mr. Hemstreet and his companies that they would not release the properties from the lost collateral locations of the units, nor would they ask Midler to do so. At the same time, That's the December 20 letter? That's correct, Your Honor. Midler, at about the same time, I think even earlier than that, said, We will not release the properties from the lost collateral. They interpreted these as they did not require a release. But both parties, in the claim, asserted, and it's a significant claim, aimed only at Midler and Merrill Lynch. There's no allegation about them being tagged. And there's some vague allegation about a payment, an assignment. And, again, the assignment, the assignee of Merrill Lynch, was still being serviced by Midler. And that's made clear in paragraph 12 of the third amendment of the claim. This assertion that Crindy May was the party that they were looking at, it's really an after-the-fact argument that was raised to avoid the statute of limitations clause. It's very clear they were going against Merrill Lynch and Midler. All of the actions occurred before January of 2001. Now, the claimants or the plaintiffs' claim about the criminal's tax-accounting duties, I would submit that there's plenty of evidence in the record to show that they did have all of the elements of the claim that they should contract, including damages. Even if they did not, they certainly could have brought a court-ordered judgment or an action for injunctive deletion based on the contract, based on Merrill Lynch and Midler's refusal to release the property. Now, with respect to the polling claim, this is a new argument on appeal, but I think that there are a couple of responses to that. Number one, the polling agreement was entered into by Crindy May on behalf of Crindy May and Michelle Bang, not Merrill Lynch. So it's insufficient to poll the statute of limitations of Merrill Lynch. And even if Crindy May had reported to do that, it would be inconsistent with the contractual limitations clause, because this is at page 3 of our brief. The clause is set forth in its entirety. The final sentence of the clause said, the one-year limitations period shall not be weighed, polled, or extended except by specific written agreement of lender. Lender is Merrill Lynch. In other references throughout the agreement, it refers to lender and trustee, Midler. But here it's only lender. So not even Midler could have polled the statute of limitations on behalf of Crindy May. There's no evidence in the record to suggest that Merrill Lynch ever polled the statute of limitations. So when that limitation period began to run in the fall of 2000, it was grand interrupted until the fall of 2001, at which point the claim for Crindy May. Turning to the specific language of the agreement, there's an argument that Mr. Neeland, the CEO and general counsel of the claim, has understood that the agreement would not be, the polling agreement meant that every element of every claim needed to be present in order to have the statute of limitations be done. And I would, that's Mr. Neeland's objective. I expressed intention that it's completely irrelevant. Oregon follows the objective period of contracts. If you look at the four corners of the agreement, it's very clear it says the first half of the clearance of oral admission. That half of the clearance of oral admission occurred in the fall of 2000. The agreement is complete by that point, and that's the first half of the limitation period. So unless the court has any further questions, I would ask that the court confirm the judgment. Just a few points very briefly. I think that if you look at the actual language of the contract provision and the evidence surrounding that, there is a question of factors. So what is the reasonable interpretation of that language? Mr. Neeland, his declaration states that he believes that provision meant that the limitation period began to run the plaintiff had knowledge of the first fact which established all elements of the claim are cause of action. And that could not occur until a hamster was actually damaged. The hamster was not actually damaged. It was worth a $2 million offer to buy the delineated property. It could not be followed through because we couldn't get the property. As far as the threatening aspects of the letter? That's the language of the contract. Those are bottom words, Your Honor. I submit that it creates another question of factors as to what they actually intended by that. I believe they're testing. This is pretty technical. Mr. Neeland, this is general counsel. Yes, sir. But was there actual damage or harm at that point? To bring... But what is the damage? I believe that you've had businessmen. Yes, one was the in-house counsel. They're trying to flush out Merrill Lynch's position, trying to get them to release the loans. They're writing threatening letters. Yes, sir. But I do not believe that that was the occurrence of a cause of action because it was so... You think that's just negotiation? Pardon me? You think that is just negotiation? Yes, sir. I do believe it was negotiation. I think that's definitely the argument that would be made to a jury on that. It would be a jury's decision as to whether at that point Hemstreet truly believed that the cause of action had occurred. Well, Hemstreet believed at that moment through that letter that damage had taken place, that it was a fait accompli. And so, at least at that stage, doesn't the old clock begin to tick? I know that the letters state that, but I don't think that they truly meant at that point they had been damaged and couldn't have been able to file a cause of action for a contract claim. Judge Vibey says the general counsel apparently thought so too. He wrote it. They were trying to flush out Merrill Lynch's position, Your Honor. That's really what that amounts to, and that is the argument that would be made at trial. It's the argument we believe creates the question of fact. For a jury to decide what was written. What the jury should be entitled to find is that the letters that were written from Hemstreet and Neelan did not meet what they said. That is Merrill Lynch's Hemstreet argument. It's evidence. It would be evidence for the jury to consider. Of course, Merrill Lynch would be arguing, well, they knew right then and there that they had a cause of action. They wrote it in their letters. We'd say there's an explanation for those words. That we're trying to flush out, we're trying to get Merrill Lynch to release the properties. They're saying, you can't look at us. You have to look at Midland. Midland's saying, you have to go back to Merrill Lynch. We're being like a ping-pong ball, back and forth. And, yes, he's a businessman, and they're writing these letters trying to flush out positions, trying to get a resolution. With regard to the cause of action, accruing as of December of 2000, again. You're over your time. I'll give you another 30 seconds. I would just ask the Court to read the excerpts, the key pages of the deposition of Mr. Neelan, and you can read it and decide whether it was really an actual sale or an actual offer to purchase the Lincoln City property. Thank you. And we'll counsel further arguments. That concludes the morning's business. Thank you.
judges: Thompson, Bybee, Mills